# Exhibit 1

**COMMONWEALTH OF VIRGINIA**
***CIRCUIT COURT OF FAIRFAX***
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**Susan Smith vs. HITT Contracting Inc**

**CASE NUMBER: CL-2026-0010919**

**TO:** **HITT Contracting Inc**
**Service: Registered Agent**
**Corporate Service Company**
**100 Shockoe Slip, 2nd Floor**
**Richmond VA 32319**

**SUMMONS – CIVIL ACTION**

**The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.**

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

**Done in the name of the Commonwealth of Virginia on July 7, 2026.**

**CHRISTOPHER J. FALCON, CLERK**
**By:** ____________________
**Deputy Clerk**

**Plaintiff's Attorney: Pro Se**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE FAIRFAX COUNTY CIRCUIT COURT**

2026 10919
Civil Action No. _____

FILED
CIVIL MAIL
2026 JUL -6 P 12:48
CHRISTOPHER J. FALCON
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | |
|---|---|
| **SUSAN SMITH,** | ) |
| Plaintiff, | ) |
| v. | ) |
| **HITT CONTRACTING INC.,** | ) |
| Defendant. | ) |

## COMPLAINT AND JURY DEMAND

### Introduction

Plaintiff Susan Smith is a seasoned risk management professional with more than twenty-five years of experience in senior-level roles overseeing insurance, compliance, and claims. She was recruited by Defendant HITT Contracting Inc. for precisely that reason: to bring rigor, transparency, and lawful discipline to its insurance and risk management practices.

Instead of valuing her expertise, Defendant punished her for it. When Ms. Smith uncovered and refused to participate in practices that misrepresented loss history, concealed a $24 million settlement, and attempted to backdate insurance coverage in violation of state law, she became the target of escalating retaliation. Within weeks of making protected disclosures, she was terminated without warning, denied benefits to which she was entitled, and even cut off from post-employment access to records that would have allowed her to protect her rights.

This case is about retaliation against an employee who did exactly what the law requires: report misconduct and refuse to mislead insurers, regulators, and counterparties. Defendant's conduct not only destroyed Ms. Smith's career, but also undermined the integrity of the workers' compensation and insurance system.

### Jurisdiction and Venue

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332. Jurisdiction exists under the federal whistleblower protections applicable to federal contractors, including the False Claims Act, and under state law claims arising under Virginia, New York, and Georgia law. Diversity jurisdiction also exists because Plaintiff and Defendant

are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in the United States District Court for Fairfax County Circuit Court because Defendant HITT Contracting Inc. maintains substantial operations there and a substantial part of the events or omissions giving rise to these claims occurred in Fairfax County.

3. Defendant HITT Contracting Inc. is subject to personal jurisdiction in Fairfax County Circuit Court by virtue of its continuous and systematic contacts with the forum and its operation of business activities giving rise to the claims alleged herein.

## Parties

4. Plaintiff Susan Smith ("Plaintiff" or "Ms. Smith") is a natural person and citizen of the State of Georgia. At all relevant times, Ms. Smith was employed by Defendant HITT Contracting Inc. in a senior risk management role. Ms. Smith has devoted her entire career to insurance risk management and compliance, including leadership roles directing corporate insurance programs, negotiating with brokers, and ensuring regulatory compliance.

5. Defendant HITT Contracting Inc. ("Defendant" or "HITT") is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Falls Church, Virginia. HITT is a general contracting firm that conducts substantial and continuous business operations within this District.

## Factual Allegations

6. Ms. Smith began her career at Liberty Mutual, where she was quickly promoted to National Accounts/Global Risk Solutions for her superior understanding of risk finance and alternative risk transfer. She served in senior executive roles at leading global insurance brokers, including Senior Vice President and Senior Managing Director positions overseeing complex construction and real estate insurance placements. She has taught continuing legal education courses to attorneys, served on a Risk Management Advisory Board, and been invited as a guest lecturer at a top-ranked risk management program, underscoring her reputation as a nationally recognized authority in the field.

7. HITT hired Ms. Smith in February 2025 as a senior risk management professional. She was recruited precisely because of her expertise in insurance law, claims handling, and broker negotiations—skills essential to keeping a fast-growing contractor in regulatory compliance. Ms. Smith quickly discovered that HITT's insurance practices were careless and reflected systemic misconduct.

8. Upon her hire in February 2025, HITT placed Smith in a senior role responsible for ensuring that the company's insurance reporting and coverage obligations were met.

9. HITT is a family-owned general contracting firm that has grown into a national powerhouse. Its rapid expansion, however, has been accompanied by systemic lapses in its insurance practices. Compliance took a back seat to expedience.

10. The company's Vice President of Risk Management, Chase Leist, lacked the training and expertise to manage complex statutory obligations and directed decisions with serious regulatory consequences.

11. Ms. Leist's professional background in risk management was limited to brief periods at regional brokers and a role at a single real estate company before joining HITT through personal connections. Colleagues at HITT repeatedly remarked that Ms. Smith's knowledge and leadership were indispensable to correcting longstanding compliance failures that Ms. Leist did not have the expertise to address.

12. Within weeks of joining HITT, Smith recognized that its practices reflected a pattern of systemic violations that threatened to mislead insurers, regulators, and project owners. When she raised concerns in good faith, Defendant responded with hostility and, ultimately, retaliation—culminating in her termination and the denial of promised benefit.

13. This action arises from Defendant's systemic insurance compliance violations and a coordinated campaign of retaliation against Ms. Smith after she reported those violations in good faith.

14. The misconduct includes concealing a $24 million settlement from required Loss Summaries, directing retroactive cancellations to mislead the New York State Insurance Fund, and manipulating its Experience Modification Rate ("EMR") reporting (a critical number required by state law that directly governs workers' compensation premiums and determines whether a contractor is eligible to bid on projects). When Plaintiff escalated these issues—including to Defendant's General Counsel—Defendant defamed her, obstructed her ability to perform, and terminated her employment.

15. Plaintiff asserts claims under Virginia Code § 40.1-27.3 (protected-disclosure retaliation), New York Labor Law § 740 (as to NYSIF/state-insurer misrepresentations), Georgia public-policy retaliation relating to workers' compensation, and common-law defamation per se, along with related remedies and damages.

## (A) Submission of Fraudulent Insurance Claims History

16. Plaintiff's duties and responsibilities included coordinating insurance requirements for Defendant's work on a major data center project located in Ashburn, Virginia.

17. On or about June 17, 2025, the data center owner's broker requested that Plaintiff provide ten years of Loss Summaries to evaluate whether Defendant had incurred any losses exceeding $2,000,000.

18. Loss Summaries are critical for insurance companies to assess risk, calculate premiums, and make underwriting decisions. Submitting false or inaccurate summaries constitutes insurance fraud.

19. Plaintiff sent an email to Defendant's Legal & Risk Management Department requesting ten years of summaries to fulfill the data center owner's request, copying her direct manager, Chase Leist, Defendant's Vice President of Risk Management and Plaintiff's direct supervisor.

20. Shortly thereafter, Plaintiff was contacted by a Senior Associate in the Claims and Risk Management Department, who advised that Leist had instructed the associate to provide Smith with only five years of loss history.

21. Plaintiff then called Leist to ask why the full ten-year request would not be honored. Leist responded that she did not want to include a $24,000,000 settlement paid by Defendant to resolve a claim arising from work on another project.

22. When Plaintiff pressed further, Leist responded, in substance, "we don't talk about it."

23. Because the $24,000,000 claim fell within the ten-year window, Plaintiff warned Leist that excluding it would mislead insurers. She asserted that she was not comfortable with the Company concealing material facts as doing so was a violation of law.

24. The following morning, Plaintiff received a ten-year summary that Leist had asked Defendant's broker to prepare. That report omitted $12 million that had previously been paid on the claim and an additional $24 million claim that was being actively litigated.

25. Plaintiff was instructed to forward the incomplete report to the owner's broker. Plaintiff complied under protest, making clear in her transmittal that she was forwarding what HITT's broker (who was copied on the email) had provided, so that she could comply with Leist's orders without appearing complicit in the concealment.

26. Knowingly providing incomplete or false loss history information constitutes misrepresentation and insurance fraud under Virginia insurance law. Plaintiff's objections to Leist's efforts to conceal information about the company's claim history constituted a protected disclosure under Virginia Code § 40.1-27.3.

## (B) Fabricated Coverage History Through Backdating

27. Within the construction industry it is widely recognized that maintaining duplicate coverage is an unacceptable practice because it creates uncertainty, invites "Other Insurance" disputes, and is often used to game the system. It is universally known to be a "Moral Hazard" in the insurance industry and is not permitted.

28. When Defendant acquired Central Consulting & Contracting, Inc. ("CCC") in January 2025, CCC's legacy policies remained in place even as Defendant added CCC to HITT's Liberty

Mutual Insurance plan. Brokers immediately pressed Leist for cancellation notices and loss policy releases ("LPRs") to eliminate the insurance overlap.

29. For weeks, Leist did nothing. Cancellation requests and LPR demands went unanswered, leaving brokers increasingly frustrated. Rather than address the problem herself, Leist eventually delegated the task to Plaintiff, by which time the backlog had only worsened.

30. To make matters worse, Leist instructed Plaintiff that the cancellations should not merely be backdated so that they were effective as of the April 1 go-live date, but should instead be backdated an additional four months to January 15, 2025, the date of the acquisition. This would have erased months of dual coverage and was designed to make it appear that CCC had never been separately insured.

31. Dragging her feet for months and then insisting on retroactive cancellation went well beyond an administrative lapse. It reflected a reckless disregard for the duty to maintain accurate and timely insurance records.

32. This recklessness was particularly disturbing because CCC's legacy policies were with the New York State Insurance Fund ("NYSIF"). Submitting incomplete or backdated information to NYSIF meant Defendant was not merely misleading a private carrier, but would be certifying and providing false information directly to the State of New York.

33. Leist's backdating plan amounted to submitting knowingly false information to a state insurer—conduct that Plaintiff reasonably believed violated New York law. Her opposition to such activity was protected activity under NYLL § 740.

34. Plaintiff immediately raised concerns internally, emphasizing that while brief overlap can occur during transitions, concealing it through backdating and incomplete reporting would mislead NYSIF and violate state reporting requirements.

35. On April 23, 2025, Plaintiff escalated the issue "Other Insurance" to Defendant's General Counsel, Sheila Sears and stated that it was a systemic issue with wholly owned subsidiaries. In fact, duplicate coverage was maintained on Washington Woodworking, Momentum Exterior Systems Inc, and Central Consulting and Contracting. Sears acknowledged familiarity with the "Other Insurance" clause and stated she would look into it. Upon information and belief, she never followed up or intervened.

36. Plaintiff reported that the backdating directive was improper, that duplicate coverage remained unresolved, and that the Company's conduct risked misleading both brokers and regulators.

37. After Plaintiff brought her concerns to the General Counsel, Leist began a campaign of hostility and marginalization against her. From that point forward, Plaintiff's professional life became increasingly untenable—her career with HITT was targeted for destruction in retaliation for refusing to go along with Leist's reckless plan.

38. CCC was not an isolated incident. Plaintiff identified and reported nearly identical situations with Leist's failure to properly cancel and record insurance coverage with other affiliates, including Washington Woodworking ("WW") and Momentum Electrical Services ("MES").

39. On April 4, 2025, Plaintiff identified duplicate coverage issues at WW and MES dating back to September 28, 2024. When Plaintiff brought the matter to Leist's attention, she responded in writing that she "thought that might be the case," and assured Plaintiff that she would address it. She did nothing. Instead, Leist left for an out-of-state vacation on April 11, 2025, and did not return until April 21, 2025, leaving the compliance risk unresolved.

40. In the case of WW, Plaintiff documented overlapping coverage and warned that it created "other insurance" conflicts and misrepresented Defendant's risk profile to insurers. She formally notified both Legal and affiliate leadership that corrective disclosure was required. No action was taken, and the duplicate coverage persisted. Affiliate leadership volunteered that multiple written requests were made to Chase Leist that began in 2024 regarding hearing of the potential to consolidate WW's insurance into HITT's insurance program. Chase never made WW aware then took it upon herself to add WW to HITT while never filing LPRs.

41. Similarly, with MES, Plaintiff flagged unresolved overlap that left millions in exposure unaccounted for. Again, Leist disregarded the warnings, tolerated the duplicate policies, and left the conflicts unresolved.

42. These parallel examples confirm that CCC was not an anomaly but part of a systemic pattern: Leist's approach to duplicate coverage relied on concealment, delay, and misrepresentation.

43. Plaintiff's disclosures regarding these practices were made in good faith and constituted protected activity under Virginia Code § 40.1-27.3 and, as to CCC's NYSIF reporting, under New York Labor Law § 740. Defendant's subsequent actions against Plaintiff—including escalating hostility, marginalization, and ultimately termination—was done in retaliation for these disclosures.

## (C) Inaccurate and Manipulated EMR Reporting

44. The Experience Modification Rate ("EMR") is calculated and published by the National Council on Compensation Insurance ("NCCI"), which requires insurers to submit accurate payroll and loss data.

45. The EMR is a critical regulatory benchmark governing both workers' compensation premiums and eligibility to bid on government projects. State laws explicitly prohibit companies from knowingly misrepresenting or concealing information related to EMR calculations.

46. Artificially lowering EMR figures constitutes fraud that can result in significant penalties, including fines, loss of bidding eligibility, and even criminal liability.

47. Plaintiff repeatedly identified mechanisms by which Defendant distorted its EMR, including: (a) manipulating Loss Summaries and concealing settlements (see *supra*, Ashburn / $24M

Settlement), (b) misrepresentations to state agencies such as NYSIF through backdating and duplicate cancellations (see *supra*, Duplicate Coverage / CCC), and (c) overlapping coverage across affiliates, resulting in claims not properly reported.

48. These practices created false EMR calculations and misled insurers and regulators. Plaintiff reasonably believed these violations of state law and NCCI rules constituted serious compliance failures, and she repeatedly raised them in good faith to her supervisors.

49. Within the construction industry it is well understood that accurate EMR reporting is required by state law and rating rules, and that submitting inconsistent or artificially favorable EMR figures is unacceptable and can jeopardize contract awards.

50. One illustration of the seriousness with which these requirements are enforced arose when Vision Technologies, Inc. ("Vision Tech"), a wholly owned HITT subsidiary, faced the risk of losing a subcontract because of inconsistent EMR reporting.

51. On June 10, 2024, Vision Tech urgently sought Plaintiff's assistance after Gilbane Building Company refused to release a subcontract on the Goucher College project because the EMR Vision Tech had received from Leist and submitted as part of their proposal was markedly lower than prior EMR data it had provided.

52. Plaintiff immediately engaged with Gilbane Building Company and with Lockton, confirmed the correct EMR, and the award was released the same day.

53. Rather than credit Plaintiff's resolution, Leist simultaneously telephoned, instant-messaged, and texted Plaintiff accusing her of mishandling the issue and failing to contact Lockton. In fact, Plaintiff had promptly contacted multiple Lockton representatives, only one of whom responded.

54. Leist went further by instructing Lockton not to communicate directly with Plaintiff, foreseeably undermining her ability to perform her compliance function. Cutting off Plaintiff's direct access to Lockton, a critical insurance broker, materially impeded her work and further evidences retaliation for her efforts to ensure accurate, lawful EMR reporting.

55. Leist's false accusations and obstruction of Plaintiff's communications with Lockton were part of a broader pattern of hostility and marginalization that escalated after Plaintiff's good-faith disclosures.

56. By portraying Plaintiff as incompetent and isolating her from essential counterparties, Defendant undercut her professional standing and made it extraordinarily difficult for her to carry out the compliance duties she was hired to perform.

57. These retaliatory actions culminated in Plaintiff's termination on July 8, 2025, in direct response to her protected activity under Virginia Code § 40.1-27.3.

## (D) Campaign of Retaliation Following Protected Disclosures

58. Plaintiff's official start date was February 7, 2025. Her offer letter provided that during the first ninety days of employment, Defendant would monitor her performance "to determine [her] ability to fulfill [her] job requirements" and could make changes "when and if necessary."

59. Plaintiff successfully completed this ninety-day evaluation period on May 7, 2025, demonstrating through her work that her more than twenty years of senior risk management experience translated into effective performance in her new role. Defendant raised no performance concerns during this period.

60. As set forth above, by spring 2025 Plaintiff had identified and raised multiple systemic compliance problems, including Defendant's concealment of a $24 million settlement in Ashburn, duplicate coverage and backdating at CCC, and EMR manipulation through altered loss histories and overlapping policies. Each of these disclosures was protected activity under Virginia Code § 40.1-27.3 and, with respect to CCC/NYSIF, under New York Labor Law § 740.

61. In early May, Leist reassigned open items relating to CCC to Plaintiff, who then engaged with CCC's executive leadership. CCC leadership volunteered their concerns regarding Leist's lack of competence and inaction since the due diligence process that began in August 2024.

62. CCC further advised Plaintiff that both CCC executives and a longtime HITT Business Unit Leader had already raised these concerns directly with Sears approximately a week earlier, meaning Sears was aware of Leist's reckless conduct but failed to intervene.

63. On April 29, 2025, six days after she communicated with the General Counsel, Plaintiff was summoned without warning to a video meeting with Leist and a Human Resources representative. During that meeting, Leist accused Plaintiff of lacking "ethics," "integrity," and "character," and asserted that Plaintiff had damaged the company's reputation with clients, brokers, and partners. These accusations were false, made without evidence, and directly impugned Plaintiff's professional honesty and fitness.

64. The accusations were defamatory per se under applicable law. They were published to at least one other person—the HR representative—and then memorialized in a follow-up email, further disseminating the defamatory statements in writing. The HR representative later acknowledged to others that the meeting was "very harsh" and that the accusations came entirely from Leist.

65. These statements were not privileged workplace evaluations, but retaliatory attacks intended to discredit Plaintiff after her disclosures. Malice is shown by the timing—only days after her GC escalation—and by Leist's later suggestion that she and Plaintiff "just have a reset," an admission that the accusations were not made in good faith.

66. Following the defamatory meeting, Leist escalated her retaliation by obstructing Plaintiff's ability to perform her compliance duties.

67. On June 10, 2024, when Plaintiff resolved an urgent EMR discrepancy for Vision Technologies on the Gilbane/Goucher project, Leist falsely accused her of mishandling the

matter. Upon information and belief, Leist also instructed Lockton not to communicate directly with Plaintiff, foreseeably impeding her ability to perform her role. These acts of obstruction isolated Plaintiff from essential counterparties and further undercut her professional standing. (See supra, EMR section.)

68. Despite this hostility, Plaintiff continued raising compliance concerns. In June 2025, she again objected to Leist's concealment of the $24 million Ashburn settlement by submitting doctored Loss Summaries, and she opposed Leist's demand that CCC cancellations be backdated to January 15, 2025 to erase months of overlap and mislead NYSIF. Each objection was protected activity under state law.

69. A substantial percentage of Defendant's business is performed on federal government projects, which require contractors to certify compliance with insurance and risk standards as a condition of award and performance. Based on her experience, Plaintiff reasonably believed that directives to conceal a multimillion-dollar settlement, to submit incomplete loss histories to brokers and insurers, and to manipulate EMR reporting for state workers' compensation purposes created a substantial risk that the same inaccurate information would be used, directly or indirectly, in federal contract bids and certifications. Plaintiff objected to these practices in good faith and escalated her concerns, including to the Company's General Counsel.

70. On June 11, 2025, Plaintiff sustained a workplace injury at Defendant's Atlanta office. The injury caused acute and debilitating back pain, to the point where she required assistance from a colleague to leave the office. She promptly reported the injury, and Defendant initiated a workers' compensation claim with Liberty Mutual. She was examined at Concentra, placed on modified duty, and began physical therapy. Her claim remained open and active.

71. On July 8, 2025—less than four weeks after her workplace injury, while she was still under physician-directed treatment, and approximately sixty days after completing probation with no performance issues—Defendant abruptly terminated her employment. She had not been placed on a performance improvement plan, given progressive discipline, or warned that her job was in jeopardy.

72. Terminating an employee in the midst of an active workers' compensation claim, while she remained under physician-directed modified duty, was part of Defendant's broader retaliatory campaign. Georgia law prohibits employers from retaliating against employees for pursuing workers' compensation benefits, see O.C.G.A. §§ 34-9-11, 34-9-81.1, and Georgia courts recognize a wrongful discharge claim when an employee is terminated for exercising workers' compensation rights.

73. Even after termination, Defendant continued its retaliation. Despite being employed at the start of Q3 2025, Plaintiff did not receive the employer's promised quarterly HSA contribution.

74. Defendant also failed to provide the Workday access they had promised in the Departure Guide. Workday is the central platform for pay records, tax documents, and benefits. On July 29, 2025, Senior HR Manager Gregory Talley admitted in writing that Plaintiff's post-employment

account had failed to generate and that the problem "appears to be ongoing." Even after a manual reset, Plaintiff's access remained unstable, preventing her from monitoring her benefits and confirming contributions.

75. Together, the denial of the quarterly HSA contribution, failure to properly process her workers' compensation claim, and the failure to provide promised Workday access deprived Plaintiff of earned benefits and obstructed her ability to protect her rights.

76. The temporal proximity of these events, the escalation after Plaintiff's GC report, the defamatory attacks on her honesty, the obstruction of her ability to perform, the firing during an active workers' compensation claim, and the post-termination denials together demonstrate a coordinated retaliatory campaign.

77. Defendant's conduct violated Virginia Code § 40.1-27.3, New York Labor Law § 740, and Georgia public policy prohibiting retaliation for pursuit of workers' compensation benefits.

78. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered lost wages and benefits, damage to her professional reputation, emotional distress, and other compensable harms.

## <u>**CAUSES OF ACTION**</u>

### **Count I**
### <u>**Retaliation in Violation of Virginia Code § 40.1-27.3**</u>

79. Plaintiff realleges and incorporates by reference the foregoing paragraphs.

80. Virginia Code § 40.1-27.3 prohibits an employer from discharging, disciplining, or otherwise retaliating against an employee because the employee, in good faith, reports or refuses to engage in conduct that the employee reasonably believes violates federal or state law.

81. Plaintiff made repeated good-faith disclosures that Defendant was concealing a $24 million settlement from required loss histories, manipulating Experience Modification Rate reporting, and directing unlawful retroactive cancellations to mislead insurers.

82. Given her twenty-five years of senior experience in insurance compliance, Plaintiff reasonably believed these practices violated state law and posed significant legal risks.

83. These disclosures were protected activity under Virginia law.

84. Defendant, acting through Vice President of Risk Management Chase Leist and others, responded by defaming Plaintiff, obstructing her ability to perform her duties, marginalizing her, and ultimately terminating her employment.

85. Defendant's conduct constitutes unlawful retaliation in violation of Virginia Code § 40.1-27.3.

**Count II**
**Retaliation in Violation of Virginia Code § 40.1-27.3**
**and New York Labor Law § 740**

86. Plaintiff realleges and incorporates by reference the foregoing paragraphs.

87. Virginia Code § 40.1-27.3 prohibits an employer from discharging, disciplining, or otherwise retaliating against an employee because the employee, in good faith, reports or refuses to engage in conduct that the employee reasonably believes violates federal or state law.

88. New York Labor Law § 740 prohibits retaliation against employees who disclose or threaten to disclose practices that present a substantial and specific danger to public health or that constitute health care fraud or insurance fraud.

89. Plaintiff objected to and reported Defendant's scheme to backdate coverage and submit inaccurate information to the New York State Insurance Fund, including misrepresentations affecting Central Consulting & Contracting, Inc. ("CCC").

90. Plaintiff's expertise in insurance reporting made her well-qualified to recognize that these practices constituted misrepresentations to a state insurer.

91. These disclosures were made in good faith and constituted protected activity under NYLL § 740.

92. Defendant retaliated against Plaintiff for making these disclosures by obstructing her communications, undermining her professional standing, and terminating her employment.

93. Defendant's conduct constitutes unlawful retaliation in violation of NYLL § 740.

**COUNT III**
**Retaliation in Violation of the False Claims Act**
**(31 U.S.C. § 3730(h))**

94. Plaintiff realleges and incorporates by reference the preceding paragraphs.

95. The False Claims Act prohibits retaliation against employees who engage in protected activity in furtherance of an FCA action or who make efforts to stop violations of the Act. 31 U.S.C. § 3730(h).

96. Plaintiff engaged in protected activity by objecting to and refusing to participate in conduct she reasonably believed could result in false or fraudulent claims or certifications

to the United States in connection with Defendants' federal contracting business, including concealment of material settlements, preparation of incomplete loss histories, and manipulation of EMR reporting.

97. Defendants knew of Plaintiff's protected activity, including her disclosures to her supervisor, to Legal & Risk Management, and to the General Counsel.

98. Defendants retaliated against Plaintiff within weeks of these disclosures by obstructing her ability to perform her job, falsely impugning her ethics and integrity, and terminating her employment.

99. As a direct and proximate result, Plaintiff has suffered lost wages and benefits, damage to her professional reputation, emotional distress, and other compensable harms. She is entitled to remedies under 31 U.S.C. § 3730(h), including reinstatement, double back pay, special damages, and attorneys' fees and costs.

**Count IV**
**Wrongful Discharge in Violation of Georgia Public Policy**
**(Workers' Compensation Retaliation)**

100. Plaintiff realleges and incorporates by reference the foregoing paragraphs.

101. Plaintiff sustained a workplace injury on June 11, 2025, and immediately reported it to Defendant's Legal & Risk Management Department. She was referred to an authorized panel physician under Georgia law and remained in active medical treatment and on modified duty through the date of her termination.

102. Georgia law and public policy prohibit employers from retaliating against employees who pursue rights under the Workers' Compensation Act, see O.C.G.A. §§ 34-9-11, 34-9-81.1, and Georgia courts recognize a wrongful discharge cause of action for such retaliation.

103. Plaintiff's professional background gave her a clear understanding of her rights under Georgia workers' compensation law and the impropriety of Defendants' retaliation.

104. Plaintiff engaged in protected activity by reporting her workplace injury, accepting medical treatment from the authorized panel, and continuing to pursue workers' compensation benefits.

105. Less than four weeks later, while Plaintiff's claim was still open and she remained under physician-imposed restrictions, Defendant terminated her employment.

106. Defendant's conduct constitutes wrongful discharge in violation of the public policy of the State of Georgia.

**Count V**
**Defamation Per Se**

107. Plaintiff realleges and incorporates by reference the foregoing paragraphs.

108. Defendant, acting through Vice President of Risk Management Chase Leist and others, published false statements that Plaintiff lacked ethics, lacked integrity, and mishandled compliance matters.

109. These statements were made to Plaintiff's colleagues and superiors, including during the April 29, 2025 "Written Reminder" meeting in front of Human Resources, and to others within Defendant's management and risk departments.

110. The statements were false, concerned Plaintiff's fitness to perform her profession, and constitute defamation per se under Virginia common law. 96. Defendant acted with knowledge of falsity or reckless disregard for the truth, and with retaliatory motive.

111. As a result of Defendant's defamatory statements, Plaintiff suffered reputational harm, emotional distress, and economic damages.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Susan Smith respectfully requests that this Court enter judgment in her favor and against Defendant HITT Contracting Inc., and award the following relief:

(a) Back pay, lost benefits, and all other compensation lost as a result of Defendant's unlawful conduct;

(b) Compensatory damages for emotional distress, reputational harm, and other non-economic injuries;

(c) Punitive damages in an amount sufficient to punish Defendant and deter similar misconduct;

(d) Pre- and post-judgment interest as allowed by law;

(e) An award of reasonable attorneys' fees, expert fees, and costs of this action; and

(f) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,



Susan Smith
Plaintiff, Pro Se

125 Sandridge Court
Alpharetta, Georgia 30022
Susan@BeaconRiskSolutionsGroup.com
(980) 800-5765

Dated: July 3, 2026